UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER ELIZABETH COOK,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:16-cv-00418 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF JENNIFER ELIZABETH COOK |

　　Jennifer Elizabeth Cook asserts she is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act.  Plaintiff seeks judicial review of the decision denying her applications for benefits, asserting the administrative law judge erred in evaluating the medical record.  Because the ALJ applied the proper legal standards and the decision is supported by substantial evidence in the record, the administrative decision is **AFFIRMED**.

## **BACKGROUND**

　　Plaintiff filed applications for benefits on July 15, 2013, in which she alleged disability beginning March 1, 2013.  (Doc. 11-3 at 17)  The Social Security Administration denied the applications at the initial level and upon reconsideration.  (*Id.*; Doc. 11-5 at 2-6, 14-19)  Plaintiff requested a hearing and testified before an ALJ on November 6, 2014.  (Doc. 11-3 at 17)  The ALJ

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill for her predecessor, Carolyn W. Colvin, as the defendant.

determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on January 30, 2015. (*Id.* at 14-29)  Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on January 22, 2016. (*Id.* at 2-5)  Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability,

the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

### A.    Relevant Medical Evidence

In June 2010, Plaintiff underwent an x-ray of her lumbar spine, which Dr. Dale Van Kirk opined showed "degenerative arthritis of the lumbar spine with degenerative disc disease" at the L4-S1 level. (Doc. 11-9 at 2)

In May 2012, Plaintiff went to the office of Dr. Narwhals Mating to request a refill of prescription pain medications, reporting the "pills help[ed] her move and do her job." (Doc. 11-8 at 11) Dr. Mating noted that in the past, Plaintiff had been diagnosed with back pain, chronic pain syndrome, and anxiety. (*Id.*) Upon examination, Dr. Mating found Plaintiff's "lower back exhibited swelling and tenderness on palpation." (*Id.* at 12) Plaintiff also "demonstrated tenderness on palpation" in the thoracolumbar spine, and her "motion was abnormal." (*Id.*) Dr. Mating prescribed Plaintiff with Norco, Soma, and Xanax. (*Id.* at 13)

In June 2012, Plaintiff continued to have pain, which she described it as "9" on the pain scale. (Doc. 11-8 at 6-7) Dr. Mating noted that Plaintiff had "tenderness on palpation" in her lower back and thoracolumbar spine. (*Id.* at 7) Dr. Mating again found Plaintiff had abnormal motion in the spine. (*Id.*)

In August and September 2012, Plaintiff went to Dr. Mating seeking prescription refills. (Doc. 11-8 at 121, 125) Plaintiff reported that she was worried her insurance would not give her a month's worth of medication. (*Id.* at 121) She continued to describe her pain level as "9." (*Id.* at 126)

The following month, Plaintiff requested a "jury excuse" from Dr. Mating, who noted Plaintiff was taking "multiple mind altering meds." (Doc. 11-8 at 118) Dr. Mating observed that Plaintiff's "lower back exhibited swelling, tenderness on palpation of the lower back, and muscle spasm of the back." (*Id.* at 119) In addition, her "thoracolumbar spine demonstrated tenderness on palpation and motion was abnormal." (*Id.*) Plaintiff described her pain as a "10" to Dr. Mating. (*Id.*)

In January 2013, Plaintiff again said the medication helped her to "move and do her job." (Doc. 11-8 at 110) She said her pain remained a "10." (*Id.*) In March 2013, she continued to describe her pain as a "10," stating she had "[i]ncreased pain from having to take care of multiple family members." (*Id.* at 104) Dr. Mating continued to prescribe Norco, Soma, and Xanax. (*Id.* at 105)

Plaintiff told Dr. Mating that she was "[l]ooking for a job" in April 2013. (Doc. 11-8 at 100) She reported the medication continued to help her move. (*Id.*) Dr. Mating found Plaintiff had a positive Tinel's test on the left side. (*Id.* at 102)

On May 7, 2013, Dr. Mating made an addendum to his treatment notes, in which he indicated: "Both father and aunt have seen me on separate occasions and told me that Jennifer is heavily using methamphetamine." (Doc. 11-8 at 100) In addition, Dr. Mating noted that Plaintiff "had problems with controlled substances at least twice since being under [his] care." (*Id.*) On May 8, Dr. Mating noted that Plaintiff tested "positive for methamphetamine and for dilaudid that she [was] not prescribed." (*Id.*, emphasis omitted) He noted that Plaintiff was "given multiple chances in the past" and opined that Plaintiff "demonstrate[d] no intention to stop her pattern of polysubstance abuse." (*Id.*, emphasis omitted) As a result, Dr. Mating cancelled Plaintiff's "pain contract" and referred Plaintiff to pain management and psychiatry. (*Id.*)

On May 9, 2013, Plaintiff visited Dr. Mating for a prescription refill, and her aunt was also present. (Doc. 11-8 at 94) Plaintiff "denie[d] any problem with drug abuse," though she admitted to using meth "three times in the last couple of months." (*Id.*, emphasis added) Dr. Mating noted that Plaintiff's aunt "strongly contradict[ed]" her, and said Plaintiff was "heavily abusing meth." (*Id.*, emphasis omitted) Dr. Mating opined the drug test results supported the assertion that Plaintiff was heavily abusing the drugs. (*Id.*)

On May 13, 2013, Plaintiff "self admitted cocaine abuse." (Doc. 11-8 at 91) Dr. Mating opined

Plaintiff was "out of control" and recommended daily pickups for her medication "until titrated to zero." (*Id.*) On May 17, Dr. Mating noted he discussed Plaintiff with a psychiatrist, who supported the decision to titrate Plaintiff off all controlled substances. (*Id.* at 61) Plaintiff denied drug abuse and said her problems were "caused by everyone else," including Dr. Mating. (*Id.*) She requested that she be able to transfer the care of the medical director. (*Id.*)

In June 2013, Plaintiff was treated by physicians' assistants, to whom she complained of "chronic pain" that was "not controlled on current medications." (Doc. 11-8 at 71, 78) In addition, Plaintiff complained of pain in her wrists, and had x-rays taken on June 27. (*Id.* at 43-44) Dr. Narin Siribhadra determined Plaintiff had "[d]egenerative arthritis of both hands especially of the thumbs." (*Id.* at 43) In addition, Dr. Siribhadra found Plaintiff's right wrist was normal. (*Id.* at 44) Dr. Mating continued the titration of her medications and directed that Plaintiff be seen on a weekly basis until the medications were titrated to zero. (*Id.* at 56) Plaintiff told Dr. Mating that she "may establish care elsewhere." (*Id.*)

On July 1, 2013, Plaintiff exhibited "no interest in medications … that were not addictive." (Doc. 11-8 at 50) Dr. Mating noted that "[t]he last time [he] stopped her ambien, a Porterville provider immediately restarted it." (*Id.*) Dr. Mating stated he would "not collaborate in the inappropriate prescribing of controlled substances," and referred Plaintiff to pain management. (*Id.*) Two days later, Plaintiff went to Sequoia Family Medical Center, seeking "to change providers and establish care" with Dr. Sidhu. (*Id.* at 131) Dr. Sidhu noted Plaintiff complained of "severe pain to hands" that inferred with her activities daily living. (*Id.*) Plaintiff also demonstrated tenderness in her back. (*Id.*) Further, Plaintiff requested refills of her pain medication and ambien, and Dr. Sidhu noted that Dr. Mating had been titrating Plaintiff's medication. (*Id.*)

In August 2013, Plaintiff told Dr. Sidhu that she had knee pain. (Doc. 11-9 at 44) The following month, she reported she had pain in both hands, but was "otherwise doing well." (*Id.* at 43)

Plaintiff reported she continued to have pain in her hands on October 4, 2013. (Doc. 11-9 at 40) In addition, Plaintiff described having "major anxiety recently" and an increase in her back pain. (*Id.*) Dr. Sidhu "okayed" an increase in her prescription for Xanax and a refill of Norco. (*Id.*) Plaintiff returned to the medical center on October 21 for treatment of a rash, but also reporting that she needed

a refill of Norco. (*Id.* at 38) However, Plaintiff was "not due until Nov. 4th" for the refill. (*Id.*)

Dr. Dale Van Kirk performed a consultative orthopedic evaluation on November 3, 2013. (Doc. 11-9 at 2) Plaintiff told Dr. Van Kirk she stopped working in November 2011 after being "let go," and "the main physical reason why she [was] not gainfully employed [was] because of chronic back pain, which started back in 2006 due to cumulative trauma." (*Id.* at 2-3) Plaintiff said her back pain "increase[d] if she [had] to lift heavy objects, twist, turn, climb, run, jump, squat, go up and down ladders, go up and down stairs frequently, or crouch or crawl, or even attempt to do these activities." (*Id.* at 3) Also, Plaintiff said she had pain in her hands, which "increase[d] with repetitive grasp or twisting motions or pushing or pulling or reaching overhead." (*Id.*) Dr. Van Kirk noted that Plaintiff sat comfortably and was able to "get[] on and off the table without difficulty." (*Id.* at 4) Plaintiff was "able to bend over to within 8 inches of touching the floor." (*Id.* at 5) Dr. Van Kirk found she had "approximately 80% of normal motion of the thumb and digits." (*Id.*) He opined Plaintiff's motor strength was "5/5" and senses were intact in her arms and legs. (*Id.* at 5-6) According to Dr. Van Kirk, Plaintiff "should be able to stand and/or walk cumulatively for six hours out of an eight-hour day," and she did not have any sitting limitations. (*Id.* at 6) In addition, Dr. Van Kirk believed Plaintiff "should be able to lift and/or carry frequently 10 pounds and occasionally 20 pounds;" frequently perform fine and gross manipulative activities; and occasionally perform postural activities. (*Id.*) Further, he opined Plaintiff "should not be required to work in an extremely code and/or damp environment." (*Id.*)

Dr. Pauline Bonilla performed a consultative psychiatric evaluation on November 9, 2013. (Doc. 11-9 at 9) Plaintiff "report[ed] a history of substance abuse," including methamphetamine and cocaine. (*Id.* at 10) She told Dr. Bonilla she used drugs "on a monthly basis," though Dr. Bonilla noted records indicated Plaintiff "used on a more frequent basis." (*Id.* at 11) Plaintiff "denied abuse of Dilaudid." (*Id.*) Dr. Bonilla observed Plaintiff made inconsistent statements regarding her substance abuse, but found "no evidence that the [plaintiff] was engaged in substance abuse at the time of the evaluation." (*Id.* at 13-14)

Dr. Lydia Kiger reviewed the record on December 6, 2013, and indicated she agreed with the assessment of Dr. Van Kirk limiting Plaintiff to "a light RFC with postural limitations," but said she "would reduce manipulatives to [occasional]." (Doc. 11-4 at 8) Accordingly, she opined Plaintiff

could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk "[a]bout 6 hours in an 8-hour workday;" sit "[a]bout 6 hours in an 8-hour workday;" and occasionally perform postural activities such as climbing, balancing, stooping, kneeling, crouching, and crawling. (*Id.* at 29-30) Dr. Kiger believed Plaintiff was limited to occasional handling and fingering "due to hand pain, tenderness, swelling" and osteoarthritis. (*Id.* at 30)

On December 20, 2013, Plaintiff demonstrated tenderness in her low back. (Doc. 11-9 at 31) In addition, she complained of pain in her knee, but did not demonstrate tenderness upon palpation or edema. (*Id.*) According to Dr. Gregory Mellor, an x-ray of the right knee showed Plaintiff had "[m]ild osteoarthritic change… with medial joint space narrowing and hypertropic spurring of the tibial spines." (*Id.* at 17)

On February 28, 2014, Plaintiff reported she had abdominal pain and cramping. (Doc. 11-9 at 25) Plaintiff requested that "forms for disability" be completed, reporting she felt she was "<u>not</u> employable." (*Id.*, emphasis in original)

Dr. Jasvir Sidhu completed a medical questionnaire on February 28, 2014. (Doc. 11-9 at 19-20) Dr. Sidhu indicated Plaintiff had been diagnosed with degenerative disc disease, chronic back pain, and osteoarthritis of the hands. (*Id.*) Dr. Sidhu offered no opinion regarding whether these impairments precluded her from performing any full time work. (*Id.*) He opined Plaintiff was able to sit for 30 minutes at one time before getting up to walk, and stand/walk for 10 minutes at a time. (*Id.*) Dr. Sidhu noted that Plaintiff had "difficulty with using [her] hands" and "loses grip" due to osteoarthritis. (*Id.*) According to Dr. Sidhu could lift up to ten pounds occasionally and ten pounds frequently. (*Id.* at 20) Although asked to estimate the "percentage of an 8-hour work day" that Plaintiff could perform manipulative activities such as reaching, grasping, pushing, pulling, and fine fingering, Dr. Sidhu noted only that Plaintiff's ability was "limited." (*Id.*) However, Dr. Sidhu opined Plaintiff could do each activity for up to fifteen minutes at one time without resting her hands. (*Id.*)

Dr. Ian Ocrant reviewed the record and completed a physical residual functional capacity assessment on March 27, 2014. (Doc. 11-4 at 8) Dr. Ocrant concluded Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk "[a]bout 6 hours in an 8-hour workday;" sit "[a]bout 6 hours in an 8-hour workday;" and occasionally perform postural activities

such as climbing, balancing, stooping, kneeling, crouching, and crawling.  (*Id.* at 48-49)  Dr. Ocrant determined Plaintiff was limited to frequently pushing, pulling, handling, fingering, and using hand controls "due to hand pain, tenderness, swelling, [osteoarthritis]."  (*Id.* at 49)

In June 2014, Plaintiff went to the hospital with burns to her left hand, right thigh, and right breast.  (Doc. 11-9 at 53)  She reported she had been "cooking a grilled cheese sandwich 10 days ago when her dress caught on fire."  (*Id.*)  Plaintiff reported it had become painful, which is why she finally went to the emergency room.  (*Id.* at 62)  She had second-degree burns, and required "[d]ebridement and homografting to the left hand and debridement and homografting to [the] right breast" on June 5.  (*Id.* at 53-54)

Dr. Vema Bolla began treating Plaintiff on September 4, 2014.  (Doc. 11-9 at 67)  In October 2014, Dr. Bolla noted Plaintiff had been diagnosed with chronic pain syndrome, and opined she was unemployable "from 10/3/14 to 10/3/15."  (*Id.* at 66)  In December 2014, Dr. Bolla opined that Plaintiff had "multiple co-morbidities" and "cannot carry out any substantial gainful activities."  (*Id.* at 67)

**B.**     **Administrative Hearing Testimony**

   **1.**     **Plaintiff's Testimony**[2]

Plaintiff testified at a hearing before the ALJ on November 6, 2014.  She reported that she was in independent studies in school and obtained a GED.  (Doc. 11-3 at 41)  In addition Plaintiff stated that she had vocational training for phlebotomy but did not use the training for any prior work.  (*Id.* at 42)  She said her work history included positions x-ray technician, putting together pamphlets for presentations, sales, delivery, bartending, and serving.  (*Id.* at 43-44)  Plaintiff believed she was no longer able to work because she could not lift items.  (*Id.* at 45)  She explained she had "[d]egenerative disc disease and degenerative arthritis and just chronic pain."  (*Id.* at 48)

She estimated that she could "sit anywhere from 20 to 60 minutes, [with] a lot of shifting."  (Doc. 11-3 at 50)  In addition, Plaintiff said she could stand about 10 to 20 minutes before she would "need to sit down and walk, rest."  (*Id.*)  She reported that her back pain was increased by "[s]itting in the same spot for too long, laying for too long, slightly bending over, a sudden twist… and lifting."

---

[2] The credibility of Plaintiff's subjective complaints is not in issue, and the information provided in the summary of her testimony is simply to provide background information.

8

(*Id.* at 51)  She estimated that she could lift about ten pounds on average, and write for "about five/ten minutes-ish before needing to rest. (*Id.* at 51-52)  Further, she believed she could reach in front of her for about thirty minutes before her elbows hurt. (*Id.* at 53)

Plaintiff testified she used medication, heat, stretching, ice packs, and rest to help her back. (Doc. 11-3 at 50)  She believed she rested in a recliner or bed for "two to three times each day," for "[a]nywhere from 20/30 minutes to 2 hours" at one time. (*Id.*)  Plaintiff reported that some of her medications caused drowsiness, nausea, and affected her memory. (*Id.* at 50, 51)  Further, Plaintiff stated she had just received authorization for physical therapy to treat a torn rotator cuff. (*Id.* at 51-52)

The ALJ questioned Plaintiff regarding drug and alcohol use, and Plaintiff reported that she smokes "[a]bout five cigarettes a day." (Doc. 11-3 at 46)  The ALJ noted the record included "references to methamphetamine and cocaine abuse," to which Plaintiff responded that she used the drugs "[y]ears and years ago." (*Id.*)  The ALJ questioned Plaintiff about "a positive tox screen," to which Plaintiff responded it was "about four or five years ago," after which the ALJ noted it was from May 2013. (*Id.*)  In addition, the ALJ questioned Plaintiff regarding the reports from her father and aunt that she was "heavily using methamphetamines, had problems with controlled substances." (*Id.*)  Plaintiff said the reports were "untrue," reporting that she "used methamphetamines with her aunt once" and her father was "a very abusive part of her life." (*Id.*)  Plaintiff stated that she attended Narcotics Anonymous meetings in the past, with the last time being "[a]bout a month-and-a-half" prior to the hearing. (*Id.* at 48)  She did not believe she had a problem with drugs. (*Id.*)

### 2. Vocational expert's testimony

Using the *Dictionary of Occupational Titles*[3], vocational expert Valerie Williams ("the VE") identified Plaintiff's past relevant work as route driver, DOT 292.353-010; estimator, DOT 169.267-038; x-ray technician, DOT 199.361-010; document preparer, DOT 249.587-018; bartender, DOT 312.474-010; and "witness, bar," DOT 311.477-010. (Doc. 11-3 at 67-68)

The ALJ asked the VE to consider "a hypothetical individual of the Claimant's age and

---

[3] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

education with the past work [she] described." (Doc. 11-3 at 68)  The ALJ stated the individual was "limited to occasionally lifting and carrying 20 pounds and frequently 10; stand and/or walk for six hours and sit for six/eight hours in an eight-hour day with normal breaks." (*Id.*)  In addition, the ALJ indicated the person was "[a]ble to perform frequent handling, fingering, pushing and pulling with the upper extremities; occasional postural including balancing, stooping, kneeling, crouching, crawling and climbing." (*Id.*)  Finally, the person was "capable of simple/routine tasks." (*Id.*)  The VE opined a worker with these limitations was able to perform Plaintiff's past relevant work as a document preparer. (*Id.*)  In addition, she reported the person could perform other light, unskilled work such as mail clerk, DOT 209.687-026; ticket taker, DOT 344.667-010; and cashier, DOT 211.462-010.  (*Id.* at 68-69)

Second, the ALJ asked the VE to consider an individual with the same limitations but to only "change the handling, fingering, pushing and pulling to occasional." (Doc. 11-3 at 69)  The VE opined the document preparer work would be eliminated due to the handling requirements. (*Id.*)  However, the VE concluded a person with these limitations was able to perform other light work. (*Id.*)  Examples identified by the VE included sandwich board carrier, DOT 299.687-014; barker, DOT 342.657-010; and usher, DOT 344.667-014. (*Id.*)

Next, the ALJ asked the VE to consider "the same hypothetical individual, limited to occasionally lifting and carrying ten pounds and frequently less than ten; stand and/or walk for two hours and sit for six to eight hours with normal breaks; frequent handling, fingering, pushing and pulling with the upper extremities; [and] occasional balancing, stooping, kneeling, crouching, crawling and climbing." (Doc. 11-3 at 69)  Further, the individual was limited to simple, routine tasks. (*Id.*)  The VE opined this hypothetical person could perform Plaintiff's past relevant work as a document preparer. (*Id.* at 69-70)  If the handling restrictions were changed to occasional, the VE opined the past relevant work would be eliminated. (*Id.* at 70-71)

**C.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial activity after the onset date of March 1, 2013. (Doc. 11-3 at 19)  Second, the ALJ found Plaintiff "degenerative disc disease, anxiety disorder, arthritis of the hands, and chronic pain syndrome." (*Id.*)  At step three, the ALJ concluded these impairments did not meet or medically equal a listed

impairment. (*Id.* at 19-20) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to occasionally lift and carry 20 pounds and occasionally 10. She can stand and or walk for 6 to 8 hours in an 8-hour day with normal breaks. She can frequently handle, finger, push, and pull with her upper extremities. She can occasionally balance, stoop, kneel, crouch, crawl, and climb. She can perform simple, routine tasks.

(*Id.* at 21) With this residual functional capacity, the ALJ found Plaintiff was "capable of performing past relevant work as a document preparer." (*Id.* at 27) In addition, the ALJ found there were "other jobs that exist in significant numbers in the national economy" that Plaintiff could perform, such as mail clerk, ticket taker, and cashier. (*Id.* at 27-28) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 28-29)

## DISCUSSION AND ANALYSIS

The plaintiff argues that the ALJ failed to properly evaluate the medical evidence, including the opinions of Drs. Sidhu and Kriger. (Doc. 15 at 8-12) On the other hand, Defendant contends that "the ALJ properly considered" the opinion of Dr. Sidhu and that any error related to Dr. Kriger's opinion was harmless. (Doc. 16 at 6-11)

### A. Evaluation of the Medical Record

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying a "clear and convincing" reason. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by

substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). Here, Plaintiff contends the ALJ erred in evaluating the opinions of Drs. Sidhu and Kriger. Because the limitations they assessed were contradicted by other physicians—including Dr. Van Kirk and Dr. Ocrant— the ALJ was required to identify specific and legitimate reasons for rejecting the opinions.

### 1. Opinion of Dr. Sidhu

The ALJ indicated he gave "limited weight" to the opinions of Dr. Sidhu concerning Plaintiff's physical residual functional capacity. (Doc. 11-3 at 23) The ALJ noted:

> On February 28, 2014, Dr. Sidhu completed a questionnaire form stating that the claimant had chronic back pain secondary to degenerative disc disease, and osteoarthritis in her hands. He stated the claimant could sit for 30 minutes at a time before getting up to walk, and stand/walk for 10 minutes at a time. He stated the claimant had difficulty using her hands, as she would lose her grip. He opined the claimant could lift ten pounds both occasionally and frequently. She could reach/grasp, handle, feel, push/pull, and perform fine finger manipulation for 15 minutes at a time before resting.

(*Id.* at 22) The ALJ found these limitations were not supported by the treatment notes and were contradicted by objective findings in the record. (*Id.* at 23) Further, the ALJ noted Plaintiff stopped seeking treatment from Dr. Sidhu after the disability questionnaire was completed. (*Id.*) Significantly, the Ninth Circuit has determined these reasons may support the decision to reject the opinion of a physician. *See, e.g., Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008) (opinion may be rejected where it is inconsistent with the physician's own treatment notes); *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 602-03 (9th Cir. 1999) (inconsistency with the overall record constitutes a legitimate reason for discounting an opinion).

#### a. Lack of clinical findings

The opinion of a physician may be rejected when it is "conclusory and brief" and lacks the support of clinical findings. *Magallanes*, 881 F.2d at 751; *see also Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (a physician's opinion may be rejected "if brief and conclusory in form with little in the way of clinical findings to support [its] conclusion"). Consequently, the Ninth Circuit determined that an ALJ may reject or give less weight to a treating physician's opinion that is in the form of a checklist, where the opinion is brief and lacks supportive objective evidence. *See Crane v. Shalala*, 76

12

F.3d 251, 253 (9th Cir. 1996) ("The ALJ permissibly rejected . . . reports that did not contain any explanation of the bases of their conclusion"); *Batson v Comm'r of Soc. Security*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("treating physicians' views carried only minimal evidentiary weight" when lacking supportive objective evidence).

For example, in *Burkhark v. Bowen*, the Ninth Circuit determined the ALJ did not err in rejecting the opinion of a treating physician where the doctor "provided nothing more than a statement of his unsupported opinion." *Id.*, 856 F.2d 1336, 1339 (9th Cir. 1988). The court found "[t]here was no description – either objective or subjective – of medical findings, personal observations or test reports upon which [the physician] could have arrived at his conclusion." *Id.* Without such information, the Court found there was "no error" by the ALJ rejecting the physician's opinions that the claimant was disabled. *Id.*

Similarly, here, Dr. Sidhu offered his opinion on a questionnaire form, and the ALJ found the "report lacked bases." (Doc. 11-3 at 23) However, as the ALJ observed, "there were no records showing range of motion testing, evaluation of the claimant's grip or muscle strength, no evaluation of the claimant's gate, and no notation of joint swelling or inflammation." (*Id.*) Rather, the treatment "notes essentially consisted of a one-page form with minimal cryptic notes." (*Id.*) Indeed, in the section on the questionnaire asking Dr. Sidhu to identify "the objective findings upon which [he] based [his] opinion," Dr. Sidhu wrote only "clinical exam." (*See* Doc. 11-9 at 19) Given Dr. Sidhu's failure to identify any clinical findings or observations that supported his conclusions, the ALJ did not err in giving less weight to the opinions.

### b. Inconsistences with the record

The Ninth Circuit explained the opinion of a physician may be rejected where an ALJ finds incongruity between a doctor's assessment and his own medical records, and the ALJ explains why the opinion "did not mesh with [his] objective data or history." *Tommasetti*, 533 F.3d at 1041. Similarly, inconsistency with the overall record constitutes a specific and legitimate reason for discounting a physician's opinion. *Morgan*, 169 F.3d at 602-03. However, to reject an opinion as inconsistent with the treatment notes or medical record, the "ALJ must do more than offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The Ninth Circuit explained: "To say that medical opinions

are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Id.*, 849 F.2d at 421-22.

In this case, the ALJ observed "there were other medical records showing the claimant had normal musculoskeletal motion and normal strength." (Doc. 11-3 at 23, citing Exh. 11 F, p. 20 [Doc. 11-9 at 64]) Further, as the ALJ noted, Dr. Van Kirk found Plaintiff had "normal wrist motion," "full motor strength, no sensory deficits, and intact reflexes" in her hands, despite having "80% of normal motion in her thumbs and digits." (*Id.* at 24) Further, Plaintiff exhibited "normal gait, normal cervical motion, and full hip, knee, and ankle motion" at the consultative examination. (*Id.*)

Because the ALJ identified specific inconsistencies, the conflict with the medical record is specific and legitimate reason for giving less weight to the opinion of Dr. Butuin. *See Thommasetti,* 553 F.3d at 1041; *see also Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion properly rejected where the treating physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]"). Moreover, the ALJ's resolution of the conflicting medical evidence must be upheld by the Court, even where there is "more than one rational interpretation of the evidence." *Allen,* 749 F.2d at 579*; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

c.    Duty to develop the record

Plaintiff acknowledges the ALJ rejected the opinion, in part, because the treatment notes included "minimal cryptic notes." (Doc. 15 at 9) According to Plaintiff, "To the extent the ALJ rejects Dr. Sidhu for being ambiguous, the ALJ should have re-contacted Dr. Sidhu in order to fully and fairly develop the record." (*Id.*, citing 20 C.F.R. §§ 404.1512(e), 416.912(e); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002))

The law is well-established in the Ninth Circuit that the ALJ has a duty "to fully and fairly develop the record and to assure the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). The duty may be discharged "in several ways, including: subpoenaing the

14

claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). However, this duty is imposed upon an ALJ only in limited circumstances. 20 C.F.R § 416.912(d)-(f) (recognizing a duty on the agency to develop medical history, re-contact medical sources, and arrange a consultative examination if the evidence received is inadequate for a disability determination). Accordingly, the duty to develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *see also Tonapetyan,* 242 F.3d at 1150 ("[a]mbiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry").

In this case, the ALJ did not find the matter was ambiguous or inadequate to allow for an evaluation of the evidence. The ALJ found Dr. Sidhu failed to identify any clinical findings to support his conclusions and offered conclusions that were inconsistent with the medical record. These findings are within the purview of the ALJ's evaluation of the medical record. *See Tommasetti*, 533 F.3d at 1041; *Morgan*, 169 F.3d at 602-03. Consequently, the Court finds the ALJ set forth specific and legitimate reasons for giving limited weight to the opinion of Dr. Sidhu, and the duty to develop the record was not triggered.

### 2. Opinion of Dr. Kriger

Although the focus of Plaintiff's appeal is upon the ALJ's evaluation of Dr. Sidhu's opinion (*see* Doc. 15 at 8), Plaintiff appears to also assert that remand is warranted because the ALJ did not address the opinion offered by Dr. Kiger. Plaintiff observes, "The ALJ's decision does not mention Dr. Kiger's opinion at all in weighing the medical evidence. The ALJ must 'explain the weight given to the opinions' of the state agency physicians and psychologists." (*Id.* at 11, quoting C.F.R. §§ 404.1527(e)(2)(ii); 416.927(e)(2)(ii))

Plaintiff observes that Dr. Kiger limited Plaintiff occasional manipulative activities while other physicians concluded Plaintiff could perform them on a frequent basis. (Doc. 15 at 11) Notably, the ALJ implicitly rejected the conclusion of Dr. Kiger by finding that Plaintiff could "frequently handle, finger, push, and pull with her upper extremities." (*See* Doc. 11-3 at 21, 24) As discussed below, the

ALJ's conclusion has the support of substantial evidence in the record. Regardless, based upon the testimony of the vocational expert, the failure to adopt the limitations identified by Dr. Kriger would not alter the ALJ's ultimate conclusion that Plaintiff was not disabled.

### a. Vocational expert's testimony

To determine whether a claimant may perform her past relevant work or other work in the national economy, the ALJ may call a vocational expert. *See Lewis*, 281 F.3d at 1083; *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). At the administrative hearing, the ALJ asked the vocational expert to consider an individual who was limited to simple, routine tasks and "limited to occasionally lifting and carrying 20 pounds and frequently 10; stand and/or walk for six hours and sit for six/eight hours in an eight-hour day with normal breaks." (Doc. 11-3 at 68) In addition, the ALJ asked the VE to consider a person who was "[a]ble to perform *frequent* handling, fingering, pushing and pulling with the upper extremities; occasional postural including balancing, stooping, kneeling, crouching, crawling and climbing." (*Id.*, emphasis added) The VE testified such a person could perform Plaintiff's past relevant work as a document preparer. (*Id.*) When the ALJ asked the VE to consider the same limitations, "chang[ing] the handling, fingering, pushing and pulling to *occasional*"—as Dr. Kriger opined— the VE opined such a person could perform other light work such as sandwich board carrier, DOT 299.687-014; barker, DOT 342.657-010; and usher, DOT 344.667-014. (*Id.* at 69)

### b. Harmless error

The vocational expert's testimony supports the conclusion that Plaintiff is able to perform work *even if* the more restrictive manipulative limitations of Dr. Kriger were adopted by the ALJ. Therefore, the adoption of the limitations would not alter the conclusion that Plaintiff is able to perform work, and the failure to address Dr. Kriger's opinion was harmless. *See Tommasetti*, 533 F.3d at 1038 (harmless error exists when the ALJ's error was inconsequential to the ultimate non-disability determination) (citations, quotations omitted); *see also Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding the ALJ's error harmless where it did not negate the validity of the ultimate conclusion).

**B.     Substantial Evidence Supports the ALJ's Decision**

When an ALJ rejects the opinion of a physician, the ALJ must not only identify a specific and

legitimate reason for rejecting the opinion, but the decision must also be "supported by substantial evidence in the record." *Lester*, 81 F.3d at 830. Accordingly, because the ALJ articulated specific and legitimate reasons for rejecting the opinion of Dr. Sidhu, the decision must be supported by substantial evidence in the record.

The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong." SSR 96-2p, 1996 SSR LEXIS 9 at *8[4]. "It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.*

The ALJ gave "significant weight" to the limitations assessed by Dr. Van Kirk, an examining physician, and Dr. Ocrant, a non-examining physician. Because Dr. Van Kirk formulated his opinions after examining Plaintiff, his findings that Plaintiff could perform light work while limited to occasional postural activities and frequent manipulative activities are substantial evidence supporting the ALJ's decision. *See Tonapetyan*, 242 F.3d at 1149 (findings from an examining physician that "rest[] on independent examination" constitute substantial evidence); *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (when an examining physician provides independent clinical findings, such findings are substantial evidence).

Likewise, the opinions of Dr. Ocrant—who opined Plaintiff could perform light work, occasionally engage in postural activities, and "frequently push and/or pull or operate hand controls"—also substantial evidence support of the ALJ's decision, as they are consistent with the limitations imposed by Dr. Van Kirk. *See Tonapetyan*, 242 F.3d 1149 (the opinions of non-examining physicians "may constitute substantial evidence when. . . consistent with other independent evidence in the record"). Consequently, the ALJ's decisions to give little weight to Dr. Sidhu's opinion and to reject Dr. Kriger's limitation to occasional manipulative limitations are supported by substantial evidence in

---

[4] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations").

the record.

**CONCLUSION AND ORDER**

For the reasons set for above, the Court finds the ALJ applied the proper legal standards in evaluating the opinion of Dr. Sidhu.  Because the ALJ's decision is supported by substantial evidence in the record, the Court must uphold the conclusion that Plaintiff was not disabled as defined by the Social Security Act.  *Sanchez*, 812 F.2d at 510; *Matney*, 981 F.2d at 1019.  Accordingly, the Court **ORDERS**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff Jennifer Cook.

IT IS SO ORDERED.

Dated:  **July 24, 2017**                            **/s/ Jennifer L. Thurston**
                                                              UNITED STATES MAGISTRATE JUDGE